United States Courts Southern
District of Texas
FILED
*4/30/2021*
Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** § | |
| § | |
| **v.** § | Criminal No. 4:21-cr-233 |
| § | |
| **MATTHEW WEBB,** § | |
| § | |
| **Defendant.** § | |

## INFORMATION

THE UNITED STATES CHARGES:

### General Allegations

At all times material to this Information, unless otherwise specified:

### Relevant Market Background

1. Natural gas was an energy commodity that was traded by buyers and sellers who bought and sold natural gas through different types of commercial transactions.

2. One way to trade natural gas was to buy or sell a "futures contract." A futures contract was an agreement that obligated the contracting parties to buy or sell a product or financial instrument at a fixed quantity and price for delivery at a specific date and time in the future.

3. Futures contracts were traded on exchanges—designated commodities markets regulated by the United States Commodity Futures Trading Commission ("CFTC"), including the New York Mercantile Exchange, Inc. ("NYMEX") and the Chicago Mercantile Exchange ("CME"), which operated through servers located in or around Chicago and Aurora, Illinois, and ICE Futures U.S., Inc. ("ICE"), which operated through servers located in or around Chicago, Illinois. NYMEX, CME, and ICE each listed different products for trading, including natural gas

futures contracts, and determined and enforced rules and procedures for trading on their respective exchanges.

4.      Natural gas traded at different prices at different physical delivery points throughout the United States.  "Henry Hub"—the delivery location (or hub) near Louisiana's Gulf Coast that connected several intrastate and interstate pipelines—was used as the standard pricing reference for natural gas futures contracts.  The price of natural gas was driven by supply and demand, which was impacted by various factors, including stored gas reserves and the weather.

5.      The exchanges offered the opportunity to trade in Henry Hub futures contracts, which were priced based upon the price of natural gas at the Henry Hub delivery point during specified time periods.

6.      A trader could place an order either to buy (a "bid") or to sell (an "offer") a certain quantity expressed in the number of contracts of a specific futures contract.  An order was "filled" when a buyer's bid price and a seller's offer price matched for a particular futures contract.  A trader who purchased a commodity established a "long" position; a trader who sold a commodity established a "short" position.

7.      Offsetting trades were opposite transactions for an equal number of contracts of the same delivery month that liquidated a purchase or sale of futures contracts and "closed" a position.  By offsetting a futures contract, a trader canceled any delivery obligation of the underlying commodity.  The net gain or loss on the trade was equal to the difference between the price of the futures contract when the trade was initiated and the price when it was offset.

8.      Futures contracts could be traded on exchanges directly through their electronic platforms or through a registered broker who served as an intermediary to match a willing buyer and seller.  Trades executed through an electronic platform were known as "screen trades."  After

matching a willing buyer and seller, a broker then submitted the executed trade to an exchange for reporting and clearing.  Brokers were prohibited from taking the other side of a customer's order absent written consent from the customer and compliance with exchange rules.

9. With limited exceptions, all purchases and sales of commodity futures were required to be executed openly and competitively.  One exception to this requirement was for certain trades, such as block trades, that complied with specific requirements under the exchange rules.  Block trades were permissible, privately negotiated transactions that met certain exchange-determined quantity thresholds and were reported to and entered on the exchange for price reporting and clearing.  While block trades were not negotiated on the open market, under exchange rules, block trades were required to be executed at fair and reasonable prices, taking into account, among other factors, the circumstances and prices of the market.

10. Fictitious sales were prohibited trades that were not bona fide, arms-length transactions.  Trades that negated market risk and competition, such as prearranged trades that were noncompetitive trades based on an express or implied agreement or understanding and predetermined terms, and accommodation trades that were noncompetitive trades intended to assist another person's illegal trades, were considered prohibited fictitious sales.

### Relevant Entities

11. "Company A," located in Houston, Texas, was an energy company that engaged in, among other business, the trading of natural gas products in the United States.  Company A was a customer of Brokerage Firm 1.

12. "Company B," located in Houston, Texas, was an energy company that engaged in, among other business, the trading of natural gas products in the United States.  Company B was a customer of Brokerage Firm 1.

13. "Brokerage Firm 1" was a registered brokerage firm in Houston, Texas, that provided brokerage services in various energy markets in exchange for commission fees. Among the services Brokerage Firm 1 provided was to facilitate block trades in natural gas futures contracts between its customers and others in the market. Brokerage Firm 1's customers considered information pertaining to their trade orders and block trade requests to be confidential, non-public information to be used by Brokerage Firm 1 only to locate a trade counterparty.

14. "Investment Company 1" was a company established by Defendant **MATTHEW WEBB ("WEBB")** for his personal investments and business.

15. "Trading Firm 1" was the trade name through which **WEBB** operated Investment Company 1 as a trading firm. Trading Firm 1 operated from the same physical office as Brokerage Firm 1 and employed only two traders. Investment Company 1 and Trading Firm 1 were established by **WEBB** to facilitate the scheme.

**Defendant**

16. **WEBB,** a resident of Houston, Texas, was the owner, president, and a registered "associated person" of Brokerage Firm 1, meaning he solicited, received, and executed customer orders in exchange for commission fees. As owner and president, **WEBB** supervised others at Brokerage Firm 1. **WEBB** was also the sole member of Investment Company 1 and one of the traders for Trading Firm 1, which **WEBB** used to trade for his own benefit. Pursuant to Brokerage Firm 1's brokerage agreement with Company A, Brokerage Firm 1's agreement with Company B, exchange rules, and CFTC regulations, for nonpublic information acquired through the broker-customer relationship, **WEBB** had a duty not to (1) disclose to unauthorized persons Company A's or Company B's material, nonpublic information, or (2) use Company A's or Company B's material, nonpublic information for his own benefit.

**Defendant's Co-Conspirators**

17. Marcus Schultz ("Schultz"), a resident of Houston, Texas, was a natural gas trader at Company A. Company A was a customer of Brokerage Firm 1 and used **WEBB** to broker trades in natural gas futures contracts.

18. John Ed James ("James"), a resident of Katy, Texas, was a natural gas trader.

19. "Person 1," a resident of Houston, Texas, was a natural gas trader at Company B. Company B was a customer of Brokerage Firm 1 and used **WEBB** to broker trades in natural gas futures contracts.

20. "Person 2" was a natural gas trader.

## COUNT ONE
### (18 U.S.C. § 371 – Conspiracy)

21. Paragraphs 1 through 20 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

22. Beginning in or around 2010 and continuing through at least in or around August 2019, the exact dates being unknown, in the Houston Division of the Southern District of Texas and elsewhere, the defendant

**MATTHEW WEBB**

knowingly and willfully, that is, with the intent to further the objects of the conspiracy, conspired and agreed with Marcus Schultz, John Ed James, Person 1, Person 2, and other individuals, known and unknown, to commit certain offenses against the United States, namely:

a. to knowingly offer to enter into, enter into, and confirm the execution of a transaction that was (1) a fictious sale and (2) used to cause any price to be reported, registered, and recorded that was not a true and bona fide price, and also involved the purchase and sale of any commodity for future

delivery, which transaction was used and may be used to (1) hedge any transaction in interstate commerce in the commodity and the product and byproduct of the commodity; (2) determine the price basis of any such transaction in interstate commerce in the commodity; and (3) deliver such commodity sold, shipped, and received in interstate commerce for the execution of the transaction, in violation of Title 7, United States Code, Sections 6c(a) and 13(a)(2);

b. to knowingly and willfully use and employ, and attempt to use and employ, in connection with a contract of sale of any commodity in interstate commerce, and for future delivery on and subject to the rules of any registered entity, any manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1(a), by (a) using and employing, and attempting to use and employ, any manipulative device, scheme, and artifice to defraud; (b) making and attempting to make any untrue and misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not true and misleading; and (c) engaging, and attempting to engage, in any act, practice, and course of business, which operates and would operate as a fraud and deceit on any person, in violation of Title 7, United States Code, Section 9(1), Title 17, Code of Federal Regulations, Section 180.1(a) and Title 7, United States Code, Section 13(a)(5);

c. to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud a person in connection with a commodity

for future delivery in violation of Title 18, United States Code, Section 1348(1); and

d.  to knowingly and intentionally devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

## The Purpose of the Conspiracy

23.  The purpose of the conspiracy was for **WEBB** and his co-conspirators to (a) enrich themselves from the profits derived from fraudulent and unlawful trading practices and misappropriation of material, nonpublic information, and (b) conceal their fraudulent and unlawful activities from Company A, Company B, market participants, the exchanges, the CFTC, and law enforcement.

## Manner and Means of the Conspiracy

24.  The manner and means by which **WEBB** and his co-conspirators sought to accomplish and did accomplish the purposes of the conspiracy included, but were not limited to, the following:

25.  **WEBB,** Schultz, James, Person 1, Person 2, and others known and unknown, agreed to and did misappropriate Company A's and/or Company B's material, non-public information and engaged in fraudulent, noncompetitive trades and prohibited fictitious sales, including prearranged trades, in natural gas futures contracts for their own personal gain.  By

7

entering into the fraudulent trades, **WEBB,** Schultz, James, Person 1, Person 2, and others caused prices to be reported, recorded, and registered that were not true, bona fide prices.

26. The fraudulent trades were reported to, entered on, and cleared through an exchange via interstate wire communications. These interstate wire communications originated from in or around Houston, Texas, and were transmitted through ICE, NYMEX, or CME servers located in Illinois.

27. To execute the scheme, Schultz and Person 1 disclosed to **WEBB** their respective companies' material, nonpublic information, including identity, trade interests, terms, and conditions, such as prices, purchase or sale, quantity, volume, source, delivery points, timing, and thresholds or limits to the terms to which Schultz or Person 1 would agree ("Inside Information") in violation of their duty of loyalty, trust, and confidentiality to their companies, knowing and intending that the Inside Information would be misappropriated and used by **WEBB,** James, Person 2, and others to enter into prearranged trades to fill Schultz's orders or Person 1's order and offsetting trades for their personal gain.

28. **WEBB** misappropriated Inside Information in violation of his duty of loyalty, trust, and confidentiality to Company A and Company B to match Schultz's orders and Person 1's orders directly with prearranged counterparties, including Trading Firm 1, James, Person 2, and others instead of pursuing a competitive price in the market in an arms-length transaction.

29. Trading Firm 1 (through or at the direction of **WEBB**), James, and others, misappropriated the Inside Information, filled Schultz's orders and/or Person 1's orders, and entered into offsetting trades in the market at a profit for their personal gain. Schultz and Person 1 made their initial, prearranged bids or offers based on the terms needed to accommodate and

make a profit in the offsetting trades, rather than at arms-length, bona fide terms to maximize the profit for Company A or Company B, respectively.

30.    Some of this fraudulent trading occurred around the United States Energy Information Administration Natural Gas Storage Report ("Storage Report"), a weekly report that measured the natural gas held in underground storage and any change that occurred the prior week. The Storage Report impacted natural gas prices and indicated if a market was bearish or bullish based on inventory in the ground. At times, **WEBB**, Schultz, and Person 1 limited downside risk when trading around the Storage Report by Schultz and Person 1, respectively, placing an order with **WEBB** that Trading Firm 1 could fill, if necessary, to limit any loss exposure.

31.    The net profits from these fraudulent trades were split between **WEBB** and the individuals involved in the particular fraudulent trade.

32.    It was a further part of the scheme that **WEBB** agreed with Person 1 that **WEBB** would provide a kickback to Person 1 and others at Person 1's direction. Specifically, **WEBB** agreed to provide Person 1 and others a portion of the commission fees Company B paid to Brokerage Firm 1. In exchange for these commission fee kickbacks, Person 1 and others agreed to direct Company B's business to Brokerage Firm 1. Person 1 increased the commission fee rate that Brokerage Firm 1 normally charged Company B in order to generate additional profits for **WEBB,** Person 1, and others.

33.    **WEBB,** Schultz, James, Person 1, and others also agreed to document certain proceeds from the scheme through Form 1099-MISCs in part to conceal the true nature of the funds and make them appear to be legitimate income paid or proceeds from a legitimate investment.

**Overt Acts**

34. In furtherance of the conspiracy and to achieve the objects thereof, **WEBB** and his co-conspirators committed and caused to be committed the following overt acts, among others, in the Southern District of Texas, and elsewhere:

35. On or about April 30, 2015, **WEBB** caused Trading Firm 1 to purchase 240 lots in Ice Natural Gas Henry Hub LD1 June 2015 futures contracts from Company B, through Person 1. **WEBB**, through Trading Firm 1, then executed five screen trades to sell the 240 lots purchased from Company B in quantities between 30 and 120 lots at prices between $2.666 and $2.689, to offset its position from its block trade with Company B, resulting in a profit for Trading Firm 1.

36. On or about May 15, 2015, **WEBB** caused Trading Firm 1 to fill an order placed by Schultz to buy 642 lots in ICE Natural Gas Henry Hub LD1 April-October 2016 futures contract at 3.179. **WEBB,** through Trading Firm 1, then entered into three long trades in 214-lot increments at the price of 3.174, 3.174, and 3.176, respectively, purchasing, in total, 642 lots in the ICE Natural Gas Henry Hub LD1 April-October 2016 futures contract to offset its short position from its block trade with Schultz at a profit.

37. On or about May 28, 2015, **WEBB** brokered a block trade for the sale of 248 lots in the Ice Natural Gas Henry Hub LD1 July 2015 futures contracts from Company B, through Person 1, to Trading Firm 1 at a price of $2.783 resulting in a trading profit for Trading Firm 1.

38. On or about September 20, 2016, **WEBB** brokered three sales of 150 lots, 200 lots, and 150 lots of the ICE Natural Gas Henry Hub October 2016 Last Day Financial contract from Company B, through Person 1, to Person 2's trading firm.

39. On or about April 2, 2017, **WEBB** caused Brokerage Firm 1 to submit an invoice to Company B for approximately $316,268.80 for trading commissions.

40. On or about April 28, 2017, **WEBB** caused Brokerage Firm 1 to pay approximately $121,970.90 to an intermediary of Person 1.

All in violation of Title 18, United States Code, Section 371.

**NOTICE OF CRIMINAL FORFEITURE**
**(18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c))**

1. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), the United States gives notice that upon the defendant's conviction of Count One of this Information, the United States will seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to the conspiracy.

2. The United States also gives notice that it will seek a money judgment against the defendant.

3. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exist, the United States will seek to forfeit any other property of the defendant up to the amount of the money judgment.

| | |
|---|---|
| Jennifer Lowery<br>Acting United States Attorney<br>Southern District of Texas | Daniel S. Kahn<br>Acting Chief, Fraud Section<br>Criminal Division<br>United States Department of Justice |
| By: *(signature)*<br>Suzanne Elmilady<br>Assistant United States Attorney<br>Southern District of Texas<br>SElmilady@usa.doj.gov<br>(713) 567-9342 | *(signature)*<br>Della Sentilles<br>Drew Bradylyons<br>Trial Attorneys<br>Criminal Division, Fraud Section<br>della.sentilles@usdoj.gov<br>drew.bradylyons@usdoj.gov<br>(202) 445-8793 (Sentilles)<br>(202) 262-7809 (Bradylyons) |